Exhibit A

**SILENCE LAW GROUP, PLLC**
Jeffrey Silence (029143)
Gideon Esakoff (037490)
20235 N. Cave Creek Blvd Ste 104 # 460
Phoenix, AZ 85024
(602) 932-8358
jeff@silencelaw.com
gideon@silencelaw.com

**FAULKNER LAW OFFICES, PLLC**
Elizabeth A. Faulkner (SBN 013212)
6945 E. Sahuaro Dr., Suite 125
Scottsdale, Arizona 85254
Telephone: (480) 951-1110
E-mail: elizabeth@faulknerlaw.net
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| McKenna Austin,<br><br>    Plaintiff,<br><br>    v.<br><br>Mogollon Treatment Center, LLC, an Arizona limited liability company; Dustin Bullard, a single man; Damon Bruns, a single man,<br><br>    Defendants. | No.  2:24-cv-03454-KML<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>(Hon. Krissa M. Lanham) |

Plaintiff McKenna Austin alleges the following claims and demands a jury trial against all Defendants on all claims and issues.

**Parties, Jurisdiction, ~~And~~and Venue**

1.    Plaintiff McKenna Austin ("Plaintiff") is an adult who currently resides in Maricopa County, Arizona.

2.    Defendant Mogollon Treatment Center, LLC (the "Company" or "~~Mogollon~~MTC") was, at all relevant times,

*SILENCE LAW GROUP*

A.   an Arizona limited liability company, with a place of business located in and/or conducting business in Gila County, Arizona; and

B.   an "employer" of Plaintiff as that term is defined in Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act ("FLSA"), A.R.S. § 23-362, and A.R.S. § 23-371, and A.R.S. § 23-1501.

3.      Defendant Dustin Bullard ("Bullard") is a single man residing in ~~Gila~~Maricopa County, Arizona.

4.      ~~Upon information and belief,~~ Bullard is a 50% member and the named managing member of ~~Mogollon~~MTC.

5.      Bullard at all relevant times has been an "employer" of Plaintiff as that term is defined in the FLSA, A.R.S. §23-362, and A.R.S. §23-371.

6.      ~~Upon information and belief,~~ Defendant Damon Bruns ("Bruns~~"),~~") is a single man residing in Maricopa County, Arizona.

7.      ~~Upon information and belief,~~ Bruns is a 50% member of ~~Mogollon~~MTC.

8.      Bruns at all relevant times has been an "employer" of Plaintiff as that term is defined in the FLSA, A.R.S. §23-362, and A.R.S. §23-371.

9.      The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff has asserted claims under Title VII of the Civil Rights Act of 1964 and the FLSA ~~and the amount in controversy exceeds $75,000~~.

10.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

**~~Defendants~~ General Allegations**

**Bruns and Bullard form ~~Defendant Mogollon Treatment Center, LLC~~MTC**

11.     Bullard and Bruns are co-owners of several business entities together.

~~11.~~12. In or around July 2021, Bruns and Bullard entered into an operating agreement ~~to create and manage Defendant Mogollon Treatment Center LLC for the purpose of generating profits~~ (the "Operating Agreement~~" or "Agreement"~~.") to create and manage MTC.

2

12.13. MogollonMTC advertises itself as "Arizona's #1 retreat" for "medical detox treatment to help individuals struggling with substance abuse and addiction"..."

14.    Bruns and Bullard jointlyeach contributed capital, labor, and/or expertise to create and manage the Company,MTC.

15.    Upon information and belief, Bullard had no previous experience in forming, funding, staffing, or operating a business.

16.    Upon information and belief, Bruns is a sophisticated and experienced entrepreneur, business owner, and executive with broad experience in forming, funding, staffing, and operating various businesses.

17.    Upon information and belief, Bruns knew at the time he entered the Operating Agreement to form MTC, or should have known, that Bullard lacked experience in forming, funding, staffing, and operating businesses.

18.    Upon information and belief, Bullard relied and continues to rely heavily on Bruns' business acumen, experience, and skill in forming, funding, staffing, and operating MTC and other businesses the two co-own.

19.    Bruns and Bullard share equally in itsthe profits and losses of MTC.

13.20. Upon information and belief, no other persons or entities have an ownership interest, or receive any share of profit from, in MTC.

14.21. Pursuant to the Operating Agreement, Bruns initially contributed $500,000 in capital to form the Company while Bullard contributed only $30,000, making Bruns the controlling financial force in the Company. .

22.    Upon information and belief, Pursuant to the Operating Agreement, Bullard contributed only $30,000.

15.23. Bruns and Bullard regularly communicatecommunicated regarding the formation and day-to-day management of the Company.

**Bruns Exercises Substantial Economic and Operational Control over MogollonMTC**

SILENCE LAW GROUP

SILENCE LAW GROUP

1    ~~16.~~24. Pursuant to the Operating Agreement, Bruns and Bullard began as 50% owners

2    of the Company, with each receiving 50% of the profits and losses.

3    ~~17.~~25. ~~The~~Pursuant to the Operating Agreement, the percentage ownership interest of

4    either member could be adjusted in proportion to new capital contributions made by either.

5    26.    ~~The~~ Upon information and belief, Bruns contributed several hundred thousand

6    dollars more in capital to MTC beyond his initial contribution of $500,000.

7    27.    Upon information and belief, Bruns has accumulated an ownership stake

8    exceeding 50%.

9    28.    Pursuant to the Operating Agreement, the "written consent" of Bruns is required

10    for major decisions~~,~~.

11    29.    Pursuant to the Operating Agreement, the "written consent" of Bruns is required

12    for major decisions including the sale of company assets, the sale or transfer of Bullard's

13    membership interest in MTC, admission of new members, substitution of members, incurring

14    of any indebtedness in excess of $100,000.00, retaining legal counsel and bringing litigation of

15    behalf of MTC, among others.

16    ~~18.~~30. Pursuant to the Operating Agreement, Bruns has the power to remove Bullard as

17    Manager for taking any ~~of these actions~~action described in the preceding paragraph without

18    ~~first obtaining Bruns~~Bruns's written consent.

19    ~~19.~~31. ~~Bruns~~Pursuant to the Operating Agreement, Bruns also has the right to remove

20    Bullard as a member for "[a]ny act of fraud, willful misconduct or gross negligence"~~.~~."

21    ~~20.~~32. Upon information and belief, Bullard ~~has the right as Manager to delegate~~

22    ~~managerial authority to Bruns and/or~~routinely sought and received Bruns' input ~~from Bruns~~

23    ~~when making managerial~~, advice, and approval over major Company decisions, including

24    decisions regarding ~~day-to-day operations of the Company.~~Plaintiff's compensation.

25    ~~21.    Bruns has not removed Bullard as Manager. To the contrary, upon information~~

26    ~~and belief, Bruns additionally contributed several hundred thousand dollars more in capital to~~

27    ~~Mogollon beyond his initial contribution of half a million dollars.~~

28

SILENCE LAW GROUP

22.    Upon information and belief, Bruns ~~may have accumulated an ownership stake exceeding 50%.~~

23.    ~~Upon information and belief, Bruns exercised financial and operational control over the conditions of employment at Mogollon, including Plaintiff's employment.~~

24.    ~~Upon information and belief,  Bruns was involved in the day-to-day management of Mogollon throughout Plaintiff's employment with Mogollon.~~

~~25.~~33.  ~~Upon  information  and  belief,  Bruns~~also  actively participates in the day-to-day management of ~~Mogollon~~MTC, including overseeing operational decisions that directly impact employee compensation and working conditions.

34.    Bullard also routinely sought and received from Bruns additional major capital contributions.

35.    For example, throughout 2022, Bruns regularly made capital contributions to the Company to enable the Company to make its payroll obligations.

36.    Bruns has not removed Bullard as Manager.

37.    Pursuant  to  the  Operating  Agreement,  Bullard  has  the  right  as  Manager  to delegate managerial authority to Bruns and/or seek input from Bruns when making managerial decisions, including regarding day-to-day operations of the Company.

38.    Bruns had the right, and, upon information and belief, exercised his right to review all business expenses, including payroll, and quarterly tax forms.

39.    Bruns  was  involved  in  and  consulted  about  day-to-day  management  of  MTC throughout Plaintiff's employment with MTC.

40.    Bruns was involved in making decisions related to a broad range of employment issues, including decisions related to employee compensation, payroll practices, classification of workers, compliance with federal law, and compliance with Arizona's paid sick leave laws.

41.    Upon information and belief, Bruns was consulted with and exercised control over retention of legal counsel to defend MTC in this matter.

42.    Upon  information  and  belief,  Bruns  was  consulted  with  and  exercised  control over retention of legal counsel to pursue counterclaims against Plaintiff on behalf of MTC.

43.    Bullard was required to obtain and did obtain Bruns' written consent when the Company became indebted to Plaintiff on or about October 15, 2024, by entering into a Settlement Agreement with Plaintiff in excess of $100,000.

44.    Upon information and belief, Bullard was required to and did obtain the written consent of Bruns when Bullard and MTC cancelled the October 2024 Settlement Agreement.

**Bruns Discussed Plaintiff's Employment and Personally Approved her Compensation**

26.45. Bruns exercised significant control over the terms and conditions of employment at MogollonMTC, including decisions affecting Plaintiff's wages, hours, and access to legally required benefits.

46.    Upon information and belief, Beginning in or around October 2021, and continuing throughout 2022, (and periodically into 2023) Plaintiff heard Bullard talking on the phone with Bruns on a regular basis about HR issues at MTC, such as hiring, firing, performance issues, payroll, and compensation.

47.    During these calls, Plaintiff heard Bullard asking Bruns for approval to make decisions related to hiring, firing, performance issues, payroll, employee work schedules, compensation, and other related employment matters.

48.    During one call in early 2023, Bullard requested and obtained Bruns' consent to finally put Plaintiff on the Company payroll.

49.    Shortly thereafter, the Company did in fact put Plaintiff on the payroll.

50.    During another call in or around May 2023, Plaintiff heard Bullard asking Bruns on the phone for his consent to make a significant adjustment in Plaintiff's pay.

51.    Shortly thereafter, the Company adjusted Plaintiff's salary accordingly.

52.    Plaintiff heard Bullard telling Bruns about how Plaintiff was designing all the bus stop shelter ads.

53.    Plaintiff heard Bullard telling Bruns about how Plaintiff was creating and posting social media content for MTC.

54.    Bruns knew or should have known that Plaintiff created the logo for MTC.

6

SILENCE LAW GROUP

55.    When Plaintiff was later terminated, upon information and belief, Bullard sought and obtained Bruns' consent to recharacterize the termination of Plaintiff's employment as a "layoff."

56.    Bruns knew that from November 2021 through December 2023, Plaintiff was the person either solely or primarily responsible for designing and publishing online marketing content for MTC.

57.    Bruns knew that beginning as early as November 2021 and continuing through December 2023, Plaintiff was performing work for MTC, including creating and publishing marketing content, recruiting employees, and acting as Bullard's executive assistant.

~~27.~~    Bruns was aware or should have been aware of ongoing violations of wage and hour laws and state and federal tax laws by ~~Mogollon~~MTC yet failed to take corrective action~~, thereby permitting such violations to continue under his authority.~~

~~28.    Upon information and belief, Bruns directly participated in or approved employment decisions, including those related to payroll practices, classification of workers, and compliance with federal law and with Arizona's paid sick leave laws.~~

~~29.~~58. ~~Bruns had the right, and, upon information and belief, exercised his right, to review all business expenses, including payroll, at the time he received distribution compensation~~.

~~30.~~59. Bruns had the right to receive and upon information and belief did receive and review state and federal tax returns submitted on behalf of the Company.

~~31.~~60. As a 50% member, Bruns was obligated to ~~personally~~ report his share of the Company's income and deductions and to make regular payments for the estimated state and federal taxes owed on that share.

**~~Defendants Failed to Pay Any Wages to~~ Plaintiff Performed ~~Services for MTC~~ From November 2021 ~~to~~through February 2023.**

~~32.~~61. Plaintiff was an employee of ~~Defendants~~MTC from at least November 2021 through her termination on December 31, 2023.

33.62. From the earliest activities of ~~Mogollon~~MTC, in early 2021, Plaintiff was intimately involved in the creation of ~~Mogollon~~MTC, including by performing the following services: acquisition of medical equipment, researching and application for medical certifications for the business, maintaining the various certifications and licensing requirements, locate and facilitate hiring physicians and other employees, facilitating the executing of the Operating Agreement, creation of the company logo and marketing materials, and other tasks instrumental to the creation and operation of the business.

34.63. In performing these services, Plaintiff regularly communicated with both Bullard and Bruns about business matters.

35.64. For example, on September 27, 2022, Plaintiff emailed Bruns asking Bruns to make an immediate payment on an invoice for ~~Mogollon's~~MTC's accreditation as a health care provider.

65.     And as set forth above, Bullard spoke with Bruns on a regular basis about the services Plaintiff was providing, and regarding employment issues generally.

**Defendants Failed to Pay any Wages to Plaintiff from November 2021 to February 2023**

36.66. Plaintiff worked an average of fifteen hours per week starting in or before November 2021 and continuing through February 2023, when she began working an average of 35-40 hours a week through her termination on December 31, 2023.

37.67. From November 2021 to February 5, 2023, Defendants did not pay Plaintiff anything for any of the hours she worked.

38.68. From November 2021 to February 5, 2023, Defendants should have paid Plaintiff at least the Arizona minimum wage, which was $12.15 in 2021, $12.80 in 2022, and $13.85 in 2023.

39.69. Plaintiff estimates she is owed at least $1,093.50 in Arizona minimum wage for 2021 for time worked beginning November 2021 (6 weeks x 15 hours per week x $12.15 per hour).

SILENCE LAW GROUP

40.70. Plaintiff estimates she is owed $9,600 in Arizona minimum wage for 2022 (50 weeks x 15 hours per week x $12.80 per hour).

41.71. Plaintiff estimates she is owed $831 in Arizona minimum wage for 2023 (4 weeks x 15 hours per week x $13.85 per hour).

42.72. In total, Plaintiff estimates she is owed at least $11,524.50 in Arizona minimum wage.

43.73. Plaintiff is entitled to an additional $23,049 (twice the amount owed in Arizona minimum wage) as a penalty for non-payment pursuant to A.R.S. § 23-364.

44.74. In total, Plaintiff is owed approximately $34,573.50 in Arizona minimum wage ($11,524.50 + $23,049).

45.75. Bruns knew or reasonably should have known that Plaintiff was regularly providing services for Mogollon MTC without receiving any compensation, in violation of federal and Arizona wage laws, as evidenced by the cash distributions Bruns regularly received, and his receipt of the Company's state and federal tax returns, among other things.

46. Bullard was required to obtain Bruns' written consent when the Company became indebted to Plaintiff on or about October 15, 2024 in excess of the principal sum of $100,000.

47.76. Upon information and belief, at the time Bruns contributed an additional several hundred thousand dollars in capital to the Company, and/ or received distributions, and/or received state and federal tax returns of the Company, Bruns knew or should have known that Plaintiff had not been paid any wages for any of the services she provided in 2021, 2022, and early 2023 until she was finally placed on the payroll.

48. Upon information and belief, at the time Bruns made his initial contribution of $500,000 to Bullard's $30,000 contribution, at the time Bruns contributed an additional couple hundred thousand dollars in capital to the Company, and/ or received distributions, and/or at the time Bruns received state and federal tax returns of the Company, Bruns knew or should have known that the Company and Bullard had borrowed tens of thousands of dollars to become

9

1 ~~indebted to Plaintiff for purchases of equipment and supplies and payroll and other business~~
2 ~~expenses.~~

3
                    **~~Mogollon~~MTC and Bullard Failed to Repay Plaintiff for the**
4                           **~~Loan~~Loaned Monies She Provided**

5    ~~49.~~77. In 2021, Plaintiff purchased equipment and supplies for Defendants, as directed
6 by Bullard, and in reliance of his promises she would be repaid, in the amount of at least
7 approximately $16,102.91.

8    ~~50.~~78. In addition, between approximately November 2021 and December 2023,
9 Plaintiff loaned ~~Mogollon~~MTC and Bullard at least approximately $58,572.89, which she was
10 told was needed to cover ~~Mogollon's~~MTC's payroll and other business and personal expenses
11 of Bullard.

12    ~~51.~~79. Bullard and ~~Mogollon~~MTC agreed to repay Plaintiff for all amounts that were
13 loaned.

14    ~~52.~~80. On July 17, 2024, Plaintiff served a demand letter demanding repayment of the
15 above loans.

16    ~~53.~~81. Bullard and ~~Mogollon~~MTC have refused to repay any of the monies loaned.

17    82.    Bruns knew or should have known that the Company and Bullard had borrowed
18 tens of thousands of dollars to become indebted to Plaintiff for purchases of equipment and
19 supplies and payroll and other business expenses.

20              **Plaintiff is Made an Official W2 Employee in February 2023**

21    ~~54.~~83. Plaintiff was put on the ~~Mogollon~~MTC payroll as a W2 employee starting
22 February 5, 2023, initially at a salary of approximately $65,000. ~~Plaintiff does not have access~~
23 ~~to her paystubs to confirm the amount of initial salary.~~

24    ~~55.~~84. Plaintiff was given the title of Marketing Director in February 2023.

25    ~~56.~~85. However, Plaintiff's job duties remained the same throughout her employment
26 with Defendants from November 2021 through her termination in December 2023.

27    ~~57.~~86. Plaintiff's job from 2021 through her termination in December 2023 included
28 acquiring supplies and equipment, assisting with obtaining certifications and licensing, locating

SILENCE LAW GROUP

1 and facilitating hiring personnel, and managing Bullard's work email communications, and

2 creating and publishing marketing content on behalf of MogollonMTC, and otherwise carrying

3 out tasks as Bullard and/or Bruns directed.

4     58.87. Even though Plaintiff was not listed as an employee of MogollonMTC prior to

5 February 5, 2023, she was an employee under each of the laws assertedidentified in this

6 hereinComplaint, because, among other things, Defendants had the right to exercise control

7 over her, and the economic realities demonstrate an employment relationship.

8     59.88. MogollonMTC increased Plaintiff's salary to $100,000 a few months after

9 making her a W2 employee in February 2023.

**Bullard Physically and Sexually Assaults Plaintiff**
**While Engaging in Disturbing Sexual Harassment**
**and Discrimination**

12     89.    Plaintiff and Bullard werewas once engaged in a sexual to marry Bullard. She is

13 the mother of three children by Bullard.

14     90.    Throughout their relationship before she started working for Defendants through

15 , and continuing long after it ended, Bullard subjected her to emotional and physical abuse and

16 sexual assault.

17     60.91. Plaintiff broke up with Bullard in November 2022 when they broke up..

18     61.    Plaintiff and Bullard have three minor children together.

19     62.92. Throughout the time Plaintiff worked for Defendants, including after she broke

20 up with Bullard, Bullard sexually harassed Plaintiff, including engaging in repeated quid pro

21 quo sex harassment.

22     63.93. On several occasions in 2023, Bullard verbally made statements to Plaintiff such

23 as "Suck my dick, or you are fired."

24     64.94. Bullard sent Plaintiff a text in 2023 stating that "Every girl ever has loved my

25 dick, and I'm rich" while stating, "It looks like someone shot you in the vagina with a 12g

26 shotgun."

11

1    ~~65.~~95. Bullard isolated and stalked Plaintiff, demanding she ~~at all times identify to him~~

2    ~~her location by GPS on her phone or otherwise. If Plaintiff failed to alert Bullard to her activities~~

3    ~~or location, he became enraged and his threats and violence escalated.~~provide her GPS location.

4        96.    If Plaintiff failed to alert Bullard to her activities or location, he became enraged,

5    and his threats and violence escalated.

6        ~~66.~~97. In October 2023, Bullard wrote to Plaintiff, "And [if] I call you, you'll answer

7    because you're my bitch."

8        ~~67.~~98. In October 2023, Bullard wrote to Plaintiff that he would put her on a "long ass

9    fucking leash" while stating that she was his "bitch."

10        ~~68.~~99. ~~In November 2023,~~ Bullard ~~wrote~~routinely referred to Plaintiff ~~that she is~~as a

11    "cunt."

12        ~~69.~~100.    In November 2023, Bullard wrote to Plaintiff, "YOU ARE FIRED" after

13    Plaintiff ~~stated~~rejected Bullard's claim that she was ~~not~~ his "bitch."

14        ~~70.~~101.    In November 2023, Plaintiff wrote, "I'm not a fucking prisoner."

15        ~~71.~~102.    Bullard responded, "I'll fire you and get full custody."

16        ~~72.~~103.    Bullard sent similar texts and made similar statements threatening to

17    terminate Plaintiff if she did not have sexual relations with him and if she did not act like his

18    "bitch."

19        104.    In or about August 2023, when Plaintiff did not immediately respond to Bullard,

20    Bullard threatened Plaintiff and her family with violence.

21        105.    Provided below is a portion of the August 2023 exchange between Plaintiff and

22    Bullard:

23            MR. BULLARD: Because I just fucking said I'm not [picking
            up the children]. That's fucking why, you stupid fucking
24            cunt. That's fucking why. Because Dustin said no, that's
            fucking why. That's the only fucking example I have to give
25            you, you fucking stupid cunt. I will literally fucking skull
            fuck you into the ground, fire you, fuck your whole family
26            up. Fuck off, cunt. Take the 100,000 and keep your fucking
            cock fucking mouth shut.
27

28

SILENCE LAW GROUP

MS. AUSTIN: My mouth is shut. I went to fucking eat.

MR. BULLARD: Yeah. You can fucking continue to keep your mouth shut, you fucking stupid cunt.

MS. AUSTIN: I went to eat.

MR. BULLARD: Yeah, yeah. Run your fucking mouth. Run your fucking mouth.

MS. AUSTIN: I went to eat. I went to eat. I went to eat. I went to eat.

MR. BULLARD: I will fucking skull fuck you into the ground...

MS. AUSTIN: What does that mean?

MR. BULLARD: ... like you have never been skull fucked in your life.

MS. AUSTIN: What does that mean? What does that mean? What does that mean? What does that mean?

MR. BULLARD: That means that I will go to court and drag you through litigation. Win or lose. I don't give a fuck. And then I'll take the kids, and at fucking 13 when they're old enough to decide, I'll buy their fucking love. And I will fucking drive your fucking face into the fucking ground mentally, not physically, and you will fucking end up fucking hating yourself, and that's how it'll go. Or you could just keep your fucking cotton mouth shut. Be like, "Oh, well, the baby daddy fucking gives me $100,000 a year, so I just... I don't... I don't [crosstalk].

MS. AUSTIN: [Crosstalk]. And I'm not allowed to fucking go out to Doll Baby and eat? I'm not allowed to go out to Doll Baby and eat?

MR. BULLARD: No, you're not. You're not allowed to go to fucking Doll Baby anymore because you've threatened to kill yourself too many times.

MS. AUSTIN: I didn't.

MR. BULLARD: Sorry, that's the end of this. Okay. Well, I'm telling you, I don't agree with you going to fuckin Doll Baby,

SILENCE LAW GROUP

1
2
3

so if you wanna go to Doll Baby and eat your food, that's fine. Shoot me a text, be like, "Hey, I'm gonna go eat my food at Doll Baby, I'm not killing myself." That's it. That's it. That's all.

4

MS. AUSTIN: Okay.

5

MR. BULLARD: I don't... I don't give a fuck.

6
7

MS. AUSTIN: When you're going out of town, shoot me a text.

8

MR. BULLARD: If you want to go out for fucking dinner with someone [crosstalk].

9
10

MS. AUSTIN: When you're going out of town for fucking 2 days across the country, shoot me a text.

11
12
13
14
15

MR. BULLARD: Okay. And when I shoot you a text... When I shoot you a text, respond and go, "Okay," and that's it. Not "K." Not "K." Expect the same in return. Not, "K. I'm going to the valley." "K, fucking da da da da da." "K, pick the fucking kids up." You stupid fucking cunt. I've explained the shit so much to you, I will never explain it again. If you wanna play fuckin' games...

16
17

MS. AUSTIN: How are you supposedly going to take 100% custody if you can't even pick up the kids for a weekend?

18
19
20

MR. BULLARD: I don't want custody, bitch! I wanna drag you through fucking litigation, make you get fucking psych evals, try to prove you're crazy, and if I don't, then you can have the kids! I will fuck you up! Keep it up, cunt!

21    73.106.    Bullard repeatedly threatened to terminate PlaintiffPlaintiff's
22 employment, via text and in person, if Plaintiff did not keep her iPhone's location services
23 turned on so that he could monitor her every move.

24
25
26
27
28

107.    For example, the following are screenshots from a sampling of Bullard's text message exchanges with Plaintiff during her employment:



74.108.    These are just some of the disturbing text messages and phones calls that Bullard sent to Plaintiff that demonstrate sexual harassment, including quid pro quo sexual harassment., criminal stalking, and criminal harassment.

109.    Bullard threatened to share screenshots of their correspondence with Bruns, in an apparent attempt to use his position as Bruns's business partner to discredit Plaintiff and to threaten her job.

75.110.    Bullard made threats in person and via text to terminate Plaintiff's employment because she would not agree to be his "bitch," would not give into his sexual demands, and opposed his sexual harassment, and opposed his criminal harassment and criminal stalking.

76.    These and the many other disturbing text messages were sent to Plaintiff after she and Bullard broke up in 2022.

SILENCE LAW GROUP

**SILENCE LAW GROUP**

<center>~~Bullard~~ Repeatedly Assaults Plaintiff **Physically and Sexually**</center>

<center>**Assaults Plaintiff**</center>

111. ~~In February 2023, Bullard~~ Throughout Plaintiff's employment—both during and after their personal relationship ended—Bullard repeatedly threatened to and did attack Plaintiff physically ~~assaulted~~.

112. After Plaintiff ~~by throwing her across the kitchen while heavily pregnant~~left their relationship in November 2022, Bullard's rage and jealousy fueled attacks escalated, and include the following:

    A. In or around December 2022, Bullard flew into an unhinged rage and overturned a couch, destroyed a Christmas tree, punched and destroyed objects around Plaintiff's home, before storming out. In doing so, Bullard intended to cause, and did cause, Plaintiff imminent fear for her physical safety.

    ~~A.~~B. In or around February 2023, Bullard threw Plaintiff across her kitchen, in front of their oldest child. At the time of this assault, Plaintiff was pregnant with their third child ~~at the time of the physical assault~~.

~~77.~~ In or around November 2023, ~~Bullard~~ sexually assaulted Plaintiff.

    ~~A.~~C. ~~During the sexual assault, Plaintiff~~ On that occasion, after she made it clear to ~~Bullard~~him that she did not want him to touch her, and that he did not have her consent ~~to touch her, but he~~ for any sexual contact, Bullard digitally penetrated her ~~anyway.~~. Bullard told Plaintiff that it was necessary for him to do so in order to inspect her genitals for signs that she had sexual relations with others.

    ~~78. Each of these assaults occurred after Plaintiff and Bullard broke up in 2022.~~

    D. On January 6, 2024, during a child exchange which occurred on MTC's Paradise Valley Recovery location in Phoenix, Bullard swung his fist at Plaintiff. He stopped the aggressive swing just inches from Plaintiff's chest. Plaintiff flinched and tried to protect herself, expecting to be punched. In swinging his fist at Plaintiff, Bullard intended to cause, and did cause, Plaintiff to fear for her imminent physical safety. On the same day, Bullard sent

<center>16</center>

1  Plaintiff an explicit video of Bullard engaging in sexual activities with a person believed to be
2  Plaintiff's replacement at MTC.

3          E.      On or about January 26, 2024, during another child exchange, Bullard
4  again assaulted Plaintiff. Plaintiff was attempting to drop her children with Bullard's mother.
5  She arranged for the exchange to occur outside the presence of Bullard, fearing that if Bullard
6  showed up, she would be in danger. Bullard showed up anyway. When Plaintiff tried to drive
7  away, Bullard used his car to block her exit. He then approached Plaintiff's open passenger
8  side window and launched himself into her passenger window. In doing so, Bullard intended
9  to cause and did cause Plaintiff imminent fear for her physical safety.

10          F.      On many occasions, Bullard threw things at Plaintiff, including plates,
11  food, and other household objects. In doing so, Bullard intended to cause and did cause Plaintiff
12  imminent fear for her physical safety.

13          G.      On many occasions, in conversations, text messages, and phone calls,
14  Bullard threatened to cause Plaintiff physical harm.

15

16      **Bullard Reduces Plaintiff's Salary ~~And~~and Terminates Plaintiff**
17      **Because She Objected To His Unlawful Sexual Assault ~~And,~~**
        **Sexual Harassment, Criminal Stalking, and Criminal**
18                          **Harassment**

19      ~~79.~~113.        From February 2023 until her termination on December 31, 2023,
20  Plaintiff's salary was lowered whenever Plaintiff opposed Bullard's sexual harassment~~.~~,
21  criminal stalking, and criminal harassment.

22      ~~80.~~114.        Plaintiff never agreed to work at a rate below her salary ~~of $65,000, and~~
23  ~~later $100,000 or~~, or to otherwise waive her earned compensation.

24      ~~81.~~115.     The ~~reduction~~reductions in her pay ~~constitutes~~constitute unlawful
25  retaliation and discrimination under Title VII.

26      ~~82.~~116.     On January 2, 2024, ~~Mogollon~~MTC sent a letter to Plaintiff stating that
27  she was being terminated effective December 31, 2023, due to a "reduction in force."

28

SILENCE LAW GROUP

1    83.117.        The termination letter states, "Mogollon Treatment Center is restructuring

2    due to an impact on both their business operations and financial structure."

3    84.118.        The letter concludes by stating, "This has no reflection of your

4    performance."

5    85.119.        BullardMTC made the decision to terminate Plaintiff less than two months

6    after Plaintiff objected to having been sexually assaulted and while making it clear in the above

7    texts that she was not his "bitch.".

8    120.  Plaintiff also told Bullard, verbally and through text, that she objected to his

9    criminal stalking and criminal harassment.

10    86.121.        MTC terminated Plaintiff because she objected to his sexual harassment

11    and his, sexual assault in November 2023., criminal stalking, and criminal harassment.

12    87.122.        Defendants cut Plaintiff's access to the Company system in December

13    2023 weeks before terminating her.

14    88.123.        The alleged after the fact alleged reduction in force was an obvious

15    pretextual reason for termination.

### Defendants Violated the Arizona Paid Sick Time Law

17    89.124.        Defendants were required to track and pay sick time for Plaintiff,

18    including the amount of her accrued and used sick leave on every paycheck.

19    90.125.        Defendants failed to pay Plaintiff any sick time and failed to track

20    Plaintiff's sick time on any pay statements.

21    91.126.        Plaintiff is entitled to the 40 hours of sick time she should have received

22    each year from 2021 until her termination.

23    92.127.        Plaintiff is also entitled to an additional amount equal to twice the amount

24    of any unpaid sick time.

25    93.128.        Bullard and Bruns knew or reasonably should have known that Plaintiff

26    was not provided paid sick time, as required by Arizona law, and failed to ensure compliance

27    with the statutory obligations under A.R.S. § 23-372.

28

1    129.    Bruns had access to, and reviewed employees' paychecks and could see that they
2    were not being paid sick as required by Arizona law.

3    94.130.        Bullard and Bruns knew or reasonably should have known that at no time
4    while carrying out employment duties for the Company, was Plaintiff provided paid sick leave.
5    Bullard and Bruns knew or reasonably should have known that at no time while carrying out
6    employment duties for the Company did the Company track any paid sick leave on Plaintiff's
7    pay stubs, or on the paystubs of any other employees.

8
9    **MogollonDefendants Entered into a Settlement Agreement with
     Plaintiff They Never Intended to Honor.**

10    131.    To recover for the immense physical, emotional, and financial harms Defendants
11    caused her, Plaintiff retained counsel.

12    132.    Through Counsel, Plaintiff, Bullard, and MTC negotiated and in October 2024
13    entered a settlement agreement to obtain Plaintiff's release of claims in exchange for payment
14    of $255,000.00 (the "Settlement Agreement").

15    133.    The Settlement Agreement required MTC to pay Plaintiff the sum of $255,000
16    by December 1, 2024, in exchange for her promises contained therein including a release of
17    her claims against Defendants Bullard, MTC and Bruns.

18    134.    The Settlement Agreement contained the following language in Section 4:

19
20    **The Parties agree that this Agreement, including the release of claims against each
      of the defendants, is, at Austin's election, null and void if the Settlement Payment is not
21    timely received, on or before the sooner of midnight 45 days from the date of execution or
      December 1, 2024.**

22

23    135.    Pursuant to this clause, the Settlement Agreement would become "null and void"
24    if the Settlement Payment was not made by midnight December 1, 2024.

25    136.    Defendants never intended to make the agreed-upon Payment to Plaintiff of
26    $255,000.

27
28

SILENCE LAW GROUP

19

SILENCE LAW GROUP

137.  Instead, on November 26, 2024, counsel for Bullard sent a letter titled "**NOTICE OF BREACH AND CANCELLATION OF AGREEMENT**" in which counsel declared the Settlement Agreement was, "canceled, effective immediately" (the "Cancellation Letter").

138.  The Cancellation Letter justified the cancellation of the Settlement Agreement on the false claim that Bullard had discovered, through a patient at MTC, that Plaintiff had disclosed the Settlement Agreement to the babysitter of Plaintiff's children.

139.  The Cancellation Letter threatens that "we will not hesitate to use this breach as evidence to counter any threatened litigation against Dustin [Bullard], Damon [Bruns] or Mogollon [Treatment Center]."

140.  Neither Bruns nor MTC objected to or otherwise departed from the positions, statements, claims, and evidence contained in the Cancellation Letter.

141.  Upon information and belief, Bullard consulted Bruns prior to the November 26, 2024 "cancellation."

142.  Bruns agreed with the decision to "cancel" the Settlement Agreement.

143.  Upon information and belief, Bruns voted in favor of "cancelling" the Settlement Agreement on behalf of MTC.

144.  Upon information and belief, Bruns voted in favor of MTC not performing under the Settlement Agreement.

145.  The decision to "cancel" the Settlement Agreement required Bruns' approval under the Operating Agreement because it meant that MTC would immediately be incurring a debt in excess of $100,000.

146.  The decision to "cancel" the Settlement Agreement required Bruns' approval under the Operating Agreement because it meant that MTC would very likely be engaged in litigation and would likely incur $100,000 or more in legal fees and costs.

147.  MTC's decision not to make the $255,000 settlement payment to Plaintiff by midnight December 1, 2024, required Bruns' approval under the Operating Agreement because it meant that MTC would immediately be incurring a debt to Plaintiff in excess of $100,000 and that MTC would be facing litigation.

148.   Following Defendants' decision to "cancel" the Settlement Agreement, MTC did not make the required settlement payment of $255,000 to Plaintiff as contractually required on December 1, 2024.

149.   By its express terms, the Settlement Agreement became a nullity when MTC did not make the Settlement Payment on December 1, 2024.

150.   With the knowledge and understanding that the Settlement Agreement had been rescinded by Defendants, and was null and void by the non-payment, Plaintiff filed this action on December 7, 2024.

**Defendants Bullard and MTC attempted to scare Plaintiff into**
**Dropping this Lawsuit**

151.   On February 14, 2025, during a telephone call between counsel for MTC, Bullard, and Plaintiff, Bullard's counsel disclosed what he claimed was evidence of a transaction involving MTC which Bullard's counsel claimed was cancelled due to Plaintiff's disclosure of the Settlement Agreement.

152.   Bullard's counsel, during that call, emailed the call participants a document dated January 18, 2025, titled "Declaration of AJ Hass" (the "Hass Declaration").

153.   The Hass Declaration included a letter of intent titled "**Letter of Intent for the Acquisition by Right Ride, Inc for Dustin Bullard's 50% of the Membership Interests of Mogollon Treatment Center, LLC**" (the "LOI") which Bullard apparently executed on November 11, 2024.

154.   The LOI is between Bullard and Right Ride Inc., an unrelated third party.

155.   MTC is not a party to the LOI.

156.   The LOI purports to call for the sale of Bullard's 50% membership in MTC in exchange for Right Ride's cash payment to Bullard of $350,000.

157.   The LOI states that Right Ride would also pay all of Bullard's taxes on the sale of his membership interest in MTC to Right Ride, Inc.

SILENCE LAW GROUP

SILENCE LAW GROUP

158.    The LOI also purports to call for Bullard and MTC to enter into a 12-month employment agreement for which Right Ride would pay Bullard, upfront, immediately upon "close," $300,000 in cash.

159.    The LOI required Right Ride, Inc. and Bullard engage in due diligence and draft and execute a Definitive Transaction Agreement.

160.    The LOI required that the Definitive Transaction Agreement include an agreement that Bullard not to compete with the business (MTC) for a period of five years from the closing.

161.    The LOI required that as part of the Due Diligence, Bullard was required to disclose to the alleged Buyer, Right Ride, Inc., sufficient information to identify all liabilities or obligations of MTC and that Bullard agree to indemnify, defend and hold harmless Right Ride, Inc. from any liabilities related to Bullard or to MTC which were not specifically identified in a document to be created between the parties referred to as "Assumed Liabilities".

162.    The LOI required that in addition to an agreement to indemnify defend and hold harmless Right Ride, Inc. from any liabilities other than the agreed-upon Assumed Liabilities, Bullard would provide security for such indemnity obligations and would provide a personal guarantee and would place in escrow of a portion of the purchase price to provide for this security.

163.    Upon information and belief, the Due Diligence required under the LOI required Bullard to disclose to the Buyer the existence of and the terms of the Settlement Agreement with Plaintiff including the settlement payment amount and date the settlement payment amount was required to be made by MTC by December 1, 2024.

164.    Upon information and belief, the alleged LOI required Bullard to disclose to Right Ride, Inc. his 50% membership interest in an entity owned and controlled by Bruns and Bullard called Paradise Valley Recovery LLC.

165.    MTC was listed as a signatory to the LOI, but it was not an actual party to the alleged LOI.

166.    No monies were to be paid to MTC as a result of the alleged LOI.

SILENCE LAW GROUP

167.    The LOI was fabricated to manufacture damages flowing from the alleged breach of the Settlement Agreement that equal or exceed the $250,000 settlement amount.

168.    The LOI is internally inconsistent and illogical.

169.    Bruns and Bullard have membership interests (or other ownership interests in) Paradise Valley Recovery, LLC ("PVR").

170.    MTC is the parent company for PVR.

171.    Bruns has a 50% membership interest in PVR.

172.    Bullard has a 50% membership interest in PVR.

173.    Upon information and belief, Bullard is employed by PVR.

174.    The LOI does not call for the sale of any of Bullard's membership interest in PVR or otherwise address his employment with PVR.

175.    Neither Plaintiff nor her counsel were aware of the alleged LOI until it was first disclosed by Bullard's counsel on February 14, 2025.

176.    Although Bullard and Bruns also own PVR, the alleged LOI did not include the sale of any portion of Bullard's 50% membership or otherwise include Bullard's continued employment with PVR.

177.    Although Bullard and Bruns also own 50% each in PVR, which provides the same services as MTC, the alleged LOI required Bullard contractually agree not to compete with MTC for a period of five years.

178.    The MTC Operating Agreement requires the advance written consent of all members (Bruns owns 50%) to admit new members or to sell or transfer a membership interest to a person or entity outside of the current members.

**MTC and Bullard are Alter Egos**

~~95.~~179.        At all relevant times, there was a unity of interest and ownership between ~~Mogollon~~MTC and Bullard.

~~96.~~180.        Bullard charged personal expenses through ~~Mogollon~~MTC.

SILENCE LAW GROUP

97.181.     Bullard asked Plaintiff to loan her personal money to cover Mogollon'sMTC's payroll.

182.   No tax withholdings were withheld on these payroll payments, and no.

98.183.   No 941 payments have been made on these payroll payments.

99.184.     Nor have they been reported to any state or federal agency on a W2 or 1099.

100.185.     Bullard purchased Plaintiff gifts using MogollonMTC funds.

101.186.     Upon information and belief, Bullard began a sexual relationship with Plaintiff's replacement and bought her (and likely other women) gifts using MogollonMTC funds.

102.187.     Bullard claims that MogollonMTC has only paid him approximately $40,000 per year since the time he and Plaintiff initiated their child custody dispute, even though he was receiving a much higher salary prior to that time.

103.188.     Upon information and belief, Bullard pays himself from MogollonMTC funds with cash.

104.189.     Upon information and belief, Bullard pays himself from MogollonMTC funds for his own personal expenses, including cars, meals, travel, and other items that he unlawfully claims as a business expense of MogollonMTC.

190.   Another example was Bullard requiring MTC to make the settlement payment agreed to between the parties in the October 2024 Settlement Agreement.

191.   MTC agreed to pay Plaintiff $255,000 in exchange for a release of her claims against Bullard, MTC and Bruns, including monies that had been allocated towards the settlement of Bullard's personal obligations, i.e., payment for Austin's injuries sustained as a result of Bullard's physical and sexual assaults.

192.   Bullard fabricated that Plaintiff had breached a nonmaterial provision of the Settlement Agreement.

105.193.     Bullard controlled MogollonMTC and made business decisions based on his own personal interests, such as terminating Plaintiff.

24

SILENCE LAW GROUP

1    106.194.    MogollonMTC is a mere instrumentality for Bullard's own affairs.

2    107.195.    There is a unity of interest between MogollonMTC and Bullard such that

3    Mogollon'sMTC's corporate form does not exist.

4    108.196.    Justice requires recognizing the substance of the relationship between

5    MogollonMTC and Bullard over their legally separate forms to prevent an injustice or fraud.

6    109.197.    An equitable result is achieved by disregarding the corporate form and

7    holding Bullard and MogollonMTC liable for each other's actions.

8    198.    Upon information and belief, Bullard is unlawfully diverting money from MTC

9    to PVR.

10    199.    Upon information and belief, Bullard is unlawfully diverting money from MTC

11    to his girlfriend, business partners, friends, and/or family.

12    200.    Bullard's brand-new Tahoe is titled in the name of his girlfriend.

13    **Plaintiff Suffered Damages.**

14    110.201.    Plaintiff suffered significant damage from the above-described conduct.

15    111.202.    Plaintiff suffered financial losses as set forth above.

16    112.203.    Plaintiff suffered consequential damages resulting from those financial

17    losses.

18    113.204.    Plaintiff suffered significant mental anguish and distress from having been

19    harassed, assaulted, and terminated.

20    114.205.    Plaintiff suffered physical and emotional injuries from the assaults.

21    115.206.    Plaintiff is entitled to punitive damages against Bullard, MTC, and

22    MogollonBruns because Bullard'stheir conduct (on behalf of himself and Mogollon and as alter

23    egos) was intentional and malicious.

24

25                                         **COUNT ONE**
26                              **Physical And Sexual Assault**
                                      **(Defendant Bullard)**

27    116.207.    Plaintiff realleges the above paragraphs as if fully set forth herein.

28    117.208.    As set forth above, Bullard physically and sexually assaulted Plaintiff.

SILENCE LAW GROUP

118.209.    As a result, Plaintiff suffered damages in an amount to be proven at trial.

**COUNT TWO**
**Hostile Work Environment Based on Sex in Violation of Title**
**VII of the Civil Rights Act of 1964**
**(Defendants Mogollon MTC and Bullard)**

119.210.    Plaintiff realleges the above paragraphs as if fully set forth herein.

120.211.    As set forth above, Bullard (in his role as an owner/named manager of Mogollon MTC) created a hostile work environment based on Plaintiff's sex (female) through his statements and text messages, physical assault, sexual assault, quid pro quo harassment, criminal stalking, criminal harassment, and reduction of Plaintiff's pay, all of which created a hostile work environment.

121.212.    As a result, Plaintiff has been damaged in an amount to be proven at trial.

122.213.    Plaintiff timely filed a charge of discrimination and retaliation with the EEOC and has received a Right to Sue letter. This lawsuit is filed in accordance with that Right to Sue Letter.

123.214.    Bullard, as an alter ego of Mogollon MTC, is liable for the actions of Mogollon MTC under Title VII.

**COUNT THREE**
**Disparate Treatment Based on Sex in Violation of Title VII of**
**the Civil Rights Act of 1964**
**(Defendants Mogollon MTC and Bullard)**

124.215.    Plaintiff realleges the above paragraphs as if fully set forth herein.

125.216.    As set forth above, Bullard (in his role as an owner/named manager of Mogollon MTC) discriminated against Plaintiff because of her sex (female) through his statements and text messages, physical assault, sexual assault, quid pro quo harassment, and reduction of Plaintiff's pay, all of which constitutes unlawful sex discrimination and disparate treatment based on Plaintiff's sex.

126.217.    Plaintiff timely filed a charge of discrimination and retaliation with the EEOC and has received a Right to Sue letter. This lawsuit is filed in accordance with that Right to Sue Letter.

26

1    ~~127.~~218.    As a result, Plaintiff has been damaged in an amount to be proven at trial.

2    ~~128.~~219.    Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of

3    ~~Mogollon~~MTC under Title VII.

**COUNT FOUR**
**Unlawful Retaliation in Violation of Title VII of the Civil**
**Rights Act of 1964 Resulting in A Hostile Work**
**(Defendants ~~Mogollon~~MTC and Bullard)**

7    ~~129.~~220.    Plaintiff realleges the above paragraphs as if fully set forth herein.

8    ~~130.~~221.    As set forth above, Bullard (in his role as an owner/named manager of

9    ~~Mogollon~~MTC) reduced Plaintiff's pay, threatened her job, threatened to challenge her custody

10   rights to her children, sexually assaulted her, and then terminated her because she opposed his

11   sexual and physical assault, sexual harassment including quid pro quo harassment, and sex

12   discrimination.

13   ~~131.~~222.    Bullard's retaliatory conduct created a hostile work environment for

14   Plaintiff.

15   ~~132.~~223.    As a result, Plaintiff has been damaged in an amount to be proven at trial.

16   ~~133.~~224.    Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of

17   ~~Mogollon~~MTC under Title VII.

**COUNT FIVE**
**Wrongful Termination – A.R.S. § 23-1501**
**(Defendants ~~Mogollon~~MTC and Bullard)**

21   ~~134.~~225.    Plaintiff realleges the above paragraphs as if fully set forth herein.

22   ~~135.~~226.    It is unlawful to terminate an employee who reports conduct to a member

23   of management that she reasonably believes violates an Arizona statute.

24   ~~136.~~227.    Assault is a crime. A.R.S. § 13-1203.

25   ~~137.~~228.    Stalking is a crime. A.R.S. § 13- 13-2923.

26   ~~138.~~229.    Threatening is a crime. A.R.S. § 13-1202.

27   230.    Criminal harassment is a crime. A.R.S. § 13-2916, A.R.S. § 13-2921, A.R.S. §

28   13-2921.

SILENCE LAW GROUP

139.231.    Plaintiff objected to Bullard when he physically and sexually assaulted her and reported to him afterwards that he had assaulted her. .

140.232.    Plaintiff objected to Bullard stalking her.

141.233.    Plaintiff objected to Bullard threatening her.

234.    Plaintiff objected to Bullard harassing her.

142.235.    Less than two months after objecting to Bullard's sexual assault in November 2023, Bullard terminated Plaintiff due to an obvious pretextual reduction in force.

143.236.    As a result, Plaintiff has been damaged in an amount to be proven at trial.

144.237.    Bullard is personally liable under A.R.S. § 23-1501 because he made the decision to terminate Plaintiff for opposing his unlawful assault. *Higgins v. Assmann Elecs.*, Inc., 217 Ariz. 289 (App. 2007).

145.238.    Bullard, as an alter ego of MogollonMTC, is liable for the actions of MogollonMTC under A.R.S. § 23-1501.

### COUNT SIX
### Failure to Pay Arizona Minimum Wage – A.R.S. § 23-364
### (All Defendants)

146.239.    Plaintiff realleges the above paragraphs as if fully set forth herein.

147.240.    Defendants did not pay Plaintiff any wages for any of the hours she worked from at least November 2021 until she was put on payroll February 5, 2023.

148.241.    Plaintiff routinely worked at least 15 hours a week from at least November 2021 through February 5, 2023, for which she was not compensatedpaid anything.

149.242.    Defendants' failure to pay Plaintiff any wages to Plaintiff from at least November 2021 to February 2023 is a violation of A.R.S. § 23-363the Arizona Minimum Wage Act.

150.243.    Any employer who fails to pay at least the required minimum wage "shall be required to pay the employee the balance of the wages owed, including interest thereon, and an additional amount equal to twice the underpaid wages." A.R.S. § 23-364.

SILENCE LAW GROUP

1    ~~151.~~244.    Plaintiff is entitled to a total of three times the amount owed in Arizona

2    minimum wage plus her attorneys' fees and costs, pursuant to A.R.S. § 23-364.

3    ~~152.~~245.    Bullard is a 50% owner of ~~Mogollon~~MTC.

4    ~~153.~~246.    Bruns is at least a 50% owner of ~~Mogollon~~MTC.

5    ~~154.~~247.    Bruns and Bullard knew or should have known that Plaintiff was working

6    for ~~Mogollon~~MTC and not being paid anything for her time.

7    ~~155.~~248.    Bruns and Bullard knowingly permitted and/or facilitated wage violations,

8    including the failure to pay ~~minimum wages, overtime and/or unemployment compensation,~~

9    ~~workers compensation, or payroll taxes~~the Arizona minimum wage.

10   ~~156.~~249.    Bruns and Bullard personally benefited from the work performed by

11   Plaintiff ~~and other employees~~ while failing to ensure compliance with ~~state and federal wage~~

12   ~~and hour laws and tax laws.~~the Arizona Minimum Wage Act.

13   ~~157.~~250.    As a result, Bruns and Bullard are ~~additionally~~ personally liable for failure

14   to pay Plaintiff at least the Arizona minimum wage for all hours worked.

15   ~~158.~~251.    Plaintiff has been damaged in an amount to be proven at trial.

16   ~~159.~~252.    Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of

17   ~~Mogollon~~MTC in failing to pay the Arizona minimum wage.

**COUNT SEVEN**
**Failure To Pay Federal Minimum Wage – FLSA**
**(All Defendants)**

21   ~~160.~~253.    Plaintiff realleges the above paragraphs as if fully set forth herein.

22   ~~161.~~254.    Plaintiff was an employee of the Defendants under the FLSA.

23   ~~162.~~255.    Bruns is a 50% (or more) owner of ~~Mogollon~~MTC.

24   ~~163.~~256.    Bullard is a 50% owner of ~~Mogollon~~MTC.

25   ~~164.~~257.    Bruns and Bullard knowingly permitted and/or facilitated wage violations,

26   including the failure to pay ~~minimum wages and overtime, unemployment compensation,~~

27   ~~workers compensation and/ or payroll taxes.~~the federal minimum wage under the FLSA.

28

~~165.~~258. Bruns and Bullard personally benefited from the work performed by Plaintiff and other employees while failing to ensure compliance with wage and hour laws.

~~166.~~259. Bruns and Bullard knew or should have known that Plaintiff was working for ~~Mogollon~~MTC and not being paid anything for her time worked from ~~at least~~ November 2021 through February 5, 2023.

~~167.~~260. As a result, Bruns and Bullard are additionally personally liable for failure to pay Plaintiff at least the federal minimum wage for all hours worked.

~~168.~~261. Defendants did not pay Plaintiff any wages for any of the hours she worked from at least November 2021 until she was put on payroll February 5, 2023.

~~169.~~262. Plaintiff routinely worked at least 15 hours a week from at least November 2021 through February 5, 2023, for which she was not ~~compensated~~paid anything.

~~170.~~263. Defendants' failure to pay Plaintiff any wages during this time ~~frame~~ is a violation of the minimum wage provision of the FLSA.

~~171.~~264. Plaintiff has been damaged in an amount to be proven at trial.

~~172.~~265. Plaintiff is entitled to liquidated damages on the amount of the federal minimum wage that should have been paid to her pursuant to 29 U.S.C. § 216(b).

~~173.~~266. Plaintiff is entitled to a mandatory award of costs and attorney's fees pursuant to 29 U.S.C. § 216(b).

~~174.~~267. Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of ~~Mogollon~~MTC under the FLSA.

## COUNT EIGHT
## Breach of Contract
## (Defendants Bullard and ~~Mogollon~~MTC)

~~175.~~268. Plaintiff realleges the above allegations as if fully set forth herein.

~~176.~~269. As set forth above, Defendants failed to repay the money that Plaintiff provided as a loan for Defendants' personal and business expenses.

~~177.~~270. Bullard, as owner of ~~Mogollon~~MTC and in his individual capacity, benefited from these loans.

1    ~~178.~~271.    Bullard used the loan money for his personal expenses and for

2    ~~Mogollon's~~MTC's payroll and business expenses.

3    ~~179.~~272.    Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of

4    ~~Mogollon~~MTC in breaching the loan agreements.

5    ~~180.~~273.    Plaintiff is entitled to an award in an amount to be proven at trial.

6    ~~181.~~274.    Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of

7    ~~Mogollon~~MTC in breaching the loan agreements.

**COUNT NINE**
**Unjust Enrichment**
**(~~Mogollon~~MTC and Bullard)**

10    ~~182.~~275.    Plaintiff realleges the above allegations as if fully set forth herein.

11    ~~183.~~276.    If the fact finder determines that there was not an enforceable agreement

12    to repay monies Plaintiff loaned to Bullard and ~~Mogollon~~MTC as set forth above, Plaintiff

13    asserts this alternative claim for unjust enrichment.

14    ~~184.~~277.    There is no justification for the enrichment of ~~Mogollon~~MTC and Bullard

15    or the impoverishment of Plaintiff.

16    ~~185.~~278.    It would be unjust for ~~Mogollon~~MTC and Bullard to retain the benefit of

17    the monies that Plaintiff loaned them with the expectation of being repaid.

18    ~~186.~~279.    Plaintiff has been damaged in an amount to be proven at trial.

19    ~~187.~~280.    Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of

20    ~~Mogollon~~MTC in breaching the loan agreements and thereby becoming unjustly enriched.

21

**COUNT TEN**
**Failure To Pay Arizona Sick ~~Leave~~ Time**
**(All Defendants)**

24    ~~188.~~281.    Plaintiff realleges the above paragraphs as if fully set forth herein.

25    ~~189.~~282.    Arizona employees are entitled to accrue and use "earned paid sick time"

26    for any of the reasons outlined under A.R.S. § 23-373.

27    ~~190.~~283.    Bullard and Bruns, as 50% owners of ~~Mogollon~~MTC, are employers

28    under the Arizona paid sick leave law and as such are personally liable.

SILENCE LAW GROUP

191.284.    Defendants were required to track and ~~notate~~note Plaintiff's earned paid sick time on each paycheck.

192.285.    Defendants failed to track or pay any of Plaintiff's earned paid sick time on her paychecks.

193.286.    Bruns and Bullard knowingly permitted and/or facilitated wage violations, including the failure to pay sick time.

194.287.    Bruns and Bullard personally benefited from the work performed by Plaintiff and other employees while failing to ensure compliance with Arizona law.

195.288.    Defendants are liable for paying the full amount of unpaid sick time, from 2021 through Plaintiff's termination, plus an amount equal to twice that amount under A.R.S. § 23-364.

196.289.    Plaintiff has been damaged in an amount to be proven at trial.

290.    Bullard, as an alter ego of ~~Mogollon~~MTC, is liable for the actions of ~~Mogollon~~MTC in violating the Arizona paid sick leave law.

**COUNT ELEVEN**
**Unlawful Retaliation Under Arizona's Paid Sick Leave Law – A.R.S. § 23-364**
**(All Defendants)**

291.    Plaintiff realleges the above paragraphs as if set forth in full.

292.    Defendants' counterclaims were brought in retaliation for Plaintiff filing this lawsuit to seek relief under A.R.S. § 23-371 et seq and A.R.S. § 23-364 for Defendants' failure to comply with Arizona's paid sick leave law.

293.    The counterclaims are baseless.

294.    MTC's decision to file counterclaims against Plaintiff required Bruns' approval because it meant that MTC would incur a debt in excess of $100,000 to pursue the claims.

295.    MTC's decision to file counterclaims against Plaintiff required Bruns' approval because it meant that MTC would subject itself to counterclaims for unlawful retaliation for filing baseless counterclaims.

32

SILENCE LAW GROUP

296.    MTC's decision to file counterclaims against Plaintiff required Bruns' approval because it meant that MTC would subject itself to having to pay Plaintiff's attorney fees under A.R.S. § 12-341.01 once she prevails on the baseless counterclaims for breach of the settlement agreement.

297.    Regardless of whether the MTC Operating Agreement required Bruns' approval to file counterclaims against Plaintiff, Bruns did in fact agree with Bullard that MTC should pursue counterclaims against Plaintiff.

298.    As set forth above, Bruns and Bullard are "employers" under A.R.S. § 23-371 et seq.

299.    As a result of Defendants' retaliatory conduct, Plaintiff has suffered emotional distress and has incurred costs and attorney's fees.

300.    Defendants Bullard and MTC's conduct in retaliating against Plaintiff for exercising her rights was intentional and malicious, entitling Plaintiff to an award of punitive damages.

301.    Plaintiff is also entitled to recover a mandatory award of attorney's fees and costs against Defendants pursuant to A.R.S. § 23-364.

302.    As a direct result of Defendants' conduct described above, Plaintiff is entitled to a minimum of $150 under A.R.S. § 23-364 for each day from when the counterclaims were filed until a final judgment is rendered.

**COUNT TWELVE**
**Unlawful Retaliation Under FLSA**
**(All Defendants)**

303.    Plaintiff realleges the above paragraphs as if set forth in full.

304.    At all relevant times, Defendants were an employer of Plaintiff under the FLSA.

305.    Defendants retaliated against Plaintiff by filing baseless counterclaims in retaliation for Plaintiff filing a FLSA claim in this lawsuit.

306.    As set forth above, Bruns joined in the decision for MTC to file baseless counterclaims.

SILENCE LAW GROUP

307.    As a result of Defendants' retaliatory conduct, Plaintiff has suffered emotional distress and has incurred costs and attorney's fees.

308.    Defendants' unlawful retaliation was intentional and malicious, entitling Plaintiff to an award of punitive damages.

309.    Plaintiff is also entitled to recover a mandatory award of attorney's fees and costs against Defendants pursuant to 29 U.S.C. § 216.

### COUNT THIRTEEN
### Unlawful Retaliation Under Arizona's Minimum Wage Act – A.R.S. § 23-364
### (All Defendants)

310.    Plaintiff realleges the above paragraphs as if set forth in full.

311.    At all relevant times, Defendants were an employer of Plaintiff under the Arizona Minimum Wage Act ("AMWA").

312.    Bullard and MTC retaliated against Plaintiff by filing baseless counterclaims in retaliation for Plaintiff exercising her rights to file this lawsuit.

313.    As set forth above, Bruns joined in the decision for MTC to file baseless counterclaims.

314.    As a result of Defendants' retaliatory conduct, Plaintiff has suffered emotional distress and has incurred costs and attorney's fees.

315.    Defendants' conduct was intentional and malicious, entitling Plaintiff to an award of punitive damages.

316.    Plaintiff is also entitled to recover her attorney's fees and costs incurred herein pursuant to A.R.S. § 23-364.

317.    As a direct result of the Defendants' conduct described above, Plaintiff is entitled to recover no less than $150 for each day from the day the counterclaims were filed until final judgment is entered. A.R.S. § 23-364.


### Demand For Trial By Jury

Plaintiff demands a trial by jury against Defendants on all claims and issues.

**SILENCE LAW GROUP**

1

**Relief Requested Against ~~Mogollon~~MTC**

2    Plaintiff requests judgment against Mogollan as follows:

3    A.    For the applicable Arizona minimum wage for all hours worked for which no

4    payment of any kind was made to Plaintiff;

5    B.    For an additional amount equal to twice the amount of unpaid Arizona

6    minimum wage pursuant to A.R.S. § 23-364;

7    C.    For the applicable federal minimum wage for all hours worked for which no

8    payment of any kind was made to Plaintiff pursuant to 29 U.S.C. § 216;

9    D.    For liquidated damages on the amount of unpaid federal minimum wage

10    pursuant to 29 U.S.C. § 216;

11    E.    For repayment of the amounts Plaintiff loaned;

12    F.    For consequential damages resulting from the failure to repay Plaintiff the

13    money she loaned;

14    G.    For unpaid sick time, paid at the higher of her effective hourly rate or the

15    applicable minimum wage, pursuant to A.R.S. § 23-364;

16    H.    For an additional amount equal to twice the amount of the unpaid sick time

17    from 2021 through her termination pursuant to A.R.S. § 23-364;

18    I.    For compensatory damages, including without limitation lost wages and

19    emotional distress pursuant to Title VII of the Civil Rights Act of 1964, A.R.S. § 23-364, the

20    FLSA, 42 U.S.C. § 2000e-5(k), and A.R.S. § 23-1501;

21    J.    For physical injuries and emotional distress for the physical and sexual assaults~~;~~

22    ~~Mogollon.~~ MTC is liable for the assaults as an alter ego of Bullard.

23    K.    For punitive damages under Title VII of the Civil Rights Act of 1964, A.R.S. §

24    23-364, the FLSA, A.R.S. § 23-1501, and for the assaults;

25    L.    For $150 per day from the day the counterclaims were filed until a final

26    judgment is entered pursuant to A.R.S. § 23-364;

27    ~~L.~~M.    For front pay under Title VII of the Civil Rights Act of 1964 of the Civil Rights

28    Act of 1964, A.R.S. § 23-364, the FLSA, 42 U.S.C. § 2000e-5(k), and A.R.S. § 23-1501;

35

SILENCE LAW GROUP

1   ~~M.~~N.   For attorney fees under A.R.S. § 12-341.01, Title VII of the Civil Rights Act

2   ~~of 1964~~ of the Civil Rights Act of 1964, A.R.S. § 12-341.01, 42 U.S.C. § 2000e-5(k), A.R.S.

3   § 23-364, 29 U.S.C. § 216, and A.R.S. § 23-364.

4   ~~N.~~O.   For an award of prejudgment and post judgment interest under applicable law;

5   ~~O.~~P.   Plaintiff's taxable costs pursuant to A.R.S. § 12-341, A.R.S. § 12-332(A), and

6   Arizona Rules of Civil Procedure Rule 54(f); and

7   ~~P.~~Q.   Such other and further relief as the court may deem just and proper.

8   **Relief Requested Against Dustin Bullard**

9   Plaintiff requests judgment against Defendant Bullard as follows:

10  A.   For the applicable Arizona minimum wage for all hours worked for which no

11  payment of any kind was made to Plaintiff;

12  B.   For an additional amount equal to twice the amount of unpaid Arizona

13  minimum wage pursuant to A.R.S. § 23-364;

14  C.   For the applicable federal minimum wage for all hours worked for which no

15  payment of any kind was made to Plaintiff pursuant to 29 U.S.C. § 216;

16  D.   For liquidated damages on the amount of unpaid federal minimum wage

17  pursuant to 29 U.S.C. § 216;

18  E.   For repayment of the amounts Plaintiff loaned;

19  F.   For consequential damages resulting from the failure to repay Plaintiff the

20  money she loaned;

21  G.   For unpaid sick time, paid at the higher of her effective hourly rate or the

22  applicable minimum wage pursuant to A.R.S. § 23-364;

23  H.   For an additional amount equal to twice the amount of the unpaid sick time

24  pursuant to A.R.S. § 23-364;

25  I.   For compensatory damages, including without limitation lost wages and

26  emotional distress pursuant to Title VII of the Civil Rights Act of 1964, the FLSA, A.R.S. §

27  23-364, 42 U.S.C. § 2000e-5(k), and A.R.S. § 23-1501;

28

36

SILENCE LAW GROUP

1    J.    Compensatory damages for physically and sexually assaulting Plaintiff,
2    including for physical harm and emotional harm;

3    K.    For punitive damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C.
4    § 2000e-5(k), the FLSA, A.R.S. § 23-364, A.R.S. § 23-1501, and for physically and sexually
5    assaulting Plaintiff;

6    L.    For $150 per day from the day the counterclaims were filed until a final
7    judgment is entered pursuant to A.R.S. § 23-364;

8    L.M.    For front pay under Title VII of the Civil Rights Act of 1964, the FLSA, A.R.S.
9    § 23-364, 42 U.S.C. § 2000e-5(k) and A.R.S. § 23-1501;

10   M.N.    For attorney fees under A.R.S. § 12-341.01, 29 U.S.C. § 216, 42 U.S.C. §
11   2000e-5(k), and A.R.S. § 23-364.

12   N.O.    For an award of prejudgment and post judgment interest under applicable law;

13   O.P.    Plaintiff's taxable costs pursuant to A.R.S. § 12-341, A.R.S. § 12-332(A), and
14   Arizona Rules of Civil Procedure Rule 54(f); and

15   P.Q.    Such other and further relief as the court may deem just and proper.

16

17   **Relief Requested Against Damon Bruns**

18   Plaintiff requests judgment against Defendant Damon Bruns as follows:

19   A.   For the applicable Arizona minimum wage for all hours worked for which no
20       payment of any kind was made to Plaintiff;

21   B.   For an additional amount equal to twice the amount of unpaid Arizona
22       minimum wage pursuant to A.R.S. § 23-364;

23   C.   For the applicable federal minimum wage for all hours worked for which no
24       payment of any kind was made to Plaintiff pursuant to 29 U.S.C. § 216;

25   D.   For liquidated damages on the amount of unpaid federal minimum wage
26       pursuant to 29 U.S.C. § 216;

27

28

E.  For unpaid sick time, ~~from 2021 through her termination~~, paid at the higher of her effective hourly rate or the applicable minimum wage pursuant to A.R.S. § 23-364;

F.  For an additional amount equal to twice the amount of the unpaid sick time pursuant to A.R.S. § 23-364;

G.  For compensatory damages, including without limitation lost wages and emotional distress pursuant to the FLSA and A.R.S. § 23-364;

H.  For punitive damages under the FLSA and A.R.S. § 23-364;

I.  For $150 per day from the day the counterclaims were filed until a final judgment is entered pursuant to A.R.S. § 23-364;

J.  For front pay under the FLSA and A.R.S. § 23-364;

~~G.~~K.      For attorney fees under 29 U.S.C. § 216 and A.R.S. § 23-364~~.~~;

~~H.~~L.      For an award of prejudgment and post judgment interest under applicable law;

~~I.~~M.      Plaintiff's taxable costs pursuant to A.R.S. § 12-341, A.R.S. § 12-332(A), and Arizona Rules of Civil Procedure Rule 54(f); and

~~J.~~N.      Such other and further relief as the court may deem just and proper.

SILENCE LAW GROUP

RESPECTFULLY SUBMITTED this 6th12th day of FebruaryMarch 2025.


**SILENCE LAW GROUP, PLLC**
**FAULKNER LAW OFFICES, PLLC**


By: */s/ Gideon Esakoff*
Jeffrey Silence
Elizabeth A. Faulkner
*Attorneys for Plaintiff*


***Certificate of Service***

I hereby certify that on the 6th12th day of February, 2025March, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Joshua W. Carden
Carden Livesay LTD
joshua@cardenlivesay.com
*Attorney for Defendant Damon Bruns*

David Kresin
Thomas Griffin
Yen Pilch Robaina & Kresin PLC
dck@yprklaw.com
ttg@yprklaw.com
*Attorney for Defendant MogollonMTC*

Leon Silver
Rebecca Cain
Silver Cain Lawyers
lsilver@silvercain.com
rcain@silvercain.com
*Attorney for Defendant Dustin Bullard*

*/s/ Gideon Esakoff*
Gideon Esakoff
*Attorney for Plaintiff*